ORAL ARGUMENT HAS NOT BEEN SCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

No. 12-5412

————————

COMMON CAUSE, *et al.*,

Appellants,

v.

VICE PRESIDENT JOSEPH R. BIDEN, Jr., *et al.*,

Appellees.

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————

**BRIEF OF APPELLEES**

————————

MORGAN J. FRANKEL
D.C. Bar #342022
morgan_frankel@legal.senate.gov
Senate Legal Counsel

PATRICIA MACK BRYAN
D.C. Bar #335463
Deputy Senate Legal Counsel

GRANT R. VINIK
D.C. Bar #459848
Assistant Senate Legal Counsel

THOMAS E. CABALLERO
Assistant Senate Legal Counsel

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
(202) 224-4435 (tel)
(202) 224-3391 (fax)

July 18, 2013                                    Counsel for Appellees

## CERTIFICATE OF COUNSEL FOR APPELLEES
## AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

This appeal arises from a civil action in the district court, No. 12-CV-00775. The plaintiffs-appellants are Common Cause, U.S. Representative John Lewis, U.S. Representative Michael Michaud, U.S. Representative Henry ("Hank") Johnson, U.S. Representative Keith Ellison, Erika Andiola, Celso Mireles, and Caesar Vargas. The defendant-appellees are Vice President Joseph R. Biden, Jr., in his official capacity as President of the Senate; Nancy Erickson, in her official capacity as Secretary of the Senate; Terrance W. Gainer, in his official capacity as Sergeant at Arms of the Senate; and Elizabeth MacDonough, in her official capacity as Senate Parliamentarian. No *amici curiae* appeared, and no parties intervened, below or, to date, in this Court.

### B. Ruling Under Review

The ruling under review on this appeal, issued by District Judge Emmet G. Sullivan on December 21, 2012, granted defendants' motion to dismiss the complaint for lack of jurisdiction. *Common Cause, et al., v. Joseph R. Biden, Jr., et al.*, 909 F. Supp. 2d 9 (D.D.C. 2012).

## C. Related Cases

This appeal has not previously been before this Court. There are no related cases pending in this Court or any other court.

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues Presented for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statutes and Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Plaintiffs' Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Proceedings Below. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      D.    The District Court's Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Statement of Facts and Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

The Senate's History of Floor Debate and the Cloture Rule. . . . . . . . . . . . . . . 12

      1.    Early History of Senate Debate and Adoption of a Cloture Rule. . . . 12

      2.    Changes in the Cloture Rule Since Its Adoption . . . . . . . . . . . . . . 14

      3.    Rule V and the Continuity of Senate Rules. . . . . . . . . . . . . . . . . . . 16

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.     The District Court Correctly Held That Plaintiffs Lack Standing. . . . . . . . 21

A.    Plaintiffs' Allegations Do Not Establish Injury-in-Fact. . . . . . . . .  23

   1.   The House Member Plaintiffs Did Not Suffer an Injury in Their
        Capacity as Members of Congress. . . . . . . . . . . . . . . . . . . . . . . . .  24

   2.   The District Court Correctly Held That Common Cause and the
        DREAM Act Plaintiffs Do Not Allege an Injury-in-Fact. . . . . . . . .  29

        a.    Common Cause lacks injury-in-fact. . . . . . . . . . . . . . . . . . .  29

        b.    DREAM Act plaintiffs lack injury-in-fact. . . . . . . . . . . . . . .  36

        c.    Plaintiffs do not have a procedural injury. . . . . . . . . . . . . . .  37

B.    Plaintiffs Do Not Demonstrate Causation or Redressability for
      Their Alleged Injuries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

II.    The District Court Correctly Held That Plaintiffs' Complaint Presents a
       Non-Justiciable Political Question. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

III.   The Court May Also Affirm on the Alternative Ground That Plaintiffs'
       Claims Are Barred by the Speech or Debate Clause. . . . . . . . . . . . . . . . .  55

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

Addendum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1A

# TABLE OF AUTHORITIES

**Cases**:

*Allen v. Wright*, 468 U.S. 737 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23

*Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810 (D.C. Cir. 2006).  . . .  34

*Am. Society for the Prevention of Cruelty to Animals v. Feld Entertainment*,
 659 F.3d 13 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 35

*Baker v. Carr*, 369 U.S. 186 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 20, 48, 51

*Basardh v. Gates*, 545 F.3d 1068 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . .  46

*Bond v. United States*, 131 S. Ct. 2355 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . .  44

*Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . .  26

*Center for Law and Educ. v. Dep't of Educ.*,
 396 F.3d 1152 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . .  18, 23, 30, 31, 39

*Chamber of Commerce v. EPA*, 642 F.3d 192 (D.C. Cir. 2011). . . . . .  22, 33-34, 34

\* *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999). . . . . . . . . . 17, 25, 27, 27-28

*City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181 (D.C. Cir. 2007). . . . . . . .  38, 45

*Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138 (2013). . . . . . . . . . . . . . . . . .  22

*Clinton v. City of New York*, 524 U.S. 417 (1998). . . . . . . . . . . . . . . . . . . . . .  40, 41

*Coleman v. Miller*, 307 U.S. 433 (1939). . . . . . . . . . . . . . . . . . . . . . . . . .  10, 25, 26

*Common Cause v. FEC*, 108 F.3d 413 (D.C. Cir. 1997). . . . . . . . . . . . . . . . .  31, 35

*Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249 (3ᵈ Cir. 2009). . . . . . . . . .  30

*Doe v. McMillan*, 412 U.S. 306 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

*Dombrowski v. Eastland*, 387 U.S. 82 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . 57

\* *Eastland v. United States Servicemen's Fund*,
   421 U.S. 491 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 55, 56, 57

*Equal Rights Center v. Post Properties, Inc.*, 633 F.3d 1136
   (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Fair Employment Council v. BMC Marketing Corp.*, 28 F.3d 1268
   (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*FEC v. Akins,* 524 U.S. 11 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996). . . . . . . . . 22, 38, 45

*Gravel v. United States*, 408 U.S. 606, 625 (1972). . . . . . . . . . . . . . . . . 55, 56, 57

*Hastings v. United States Senate, Impeachment Trial Comm.*,
   716 F. Supp. 38 (D.D.C.), *aff'd*, 887 F.2d 332
   (D.C. Cir. 1989) (table). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116
   (2ᵈ Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). . . . . . . . . . 17, 18, 29-30, 32

*Hoffman v. Jeffords*, 175 F. Supp. 2d 49 (D.D.C. 2001),
   *aff'd*, 2002 WL 1364311 (D.C. Cir. May 6, 2002). . . . . . . . . . . . . . . . . . 36

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*,
   284 F. Supp. 2d 15 (D.D.C. 2003), *aff'd*,
   98 Fed. App'x 8 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Howard v. Office of Chief Administrative Officer of
   U.S. House of Representatives*, — F.3d —,
   2013 WL 3242113 (D.C. Cir. June 28, 2013). . . . . . . . . . . . . . . . . . . . . 55, 57

*Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995). . . . . . . . . . . . . . .  39

*Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333 (1977). . . . . . . .  34

*INS v. Chadha*, 462 U.S. 919 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40, 41

\* *Judicial Watch, Inc. v. United States Senate*, 340 F. Supp. 2d 26
    (D.D.C. 2004), *aff'd*, 432 F. 3d 359 (D.C. Cir. 2005). . . . . . . . .  4, 20, 47, 54

*Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1974). . . . . . . . . . . . . . . . . . . .  27, 28

*Kilbourn v. Thompson*, 103 U.S. 168 (1881). . . . . . . . . . . . . . . . . . . . . . . . .  56, 57

*Lin v. United States*, 561 F.3d 502 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . .  2

\* *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . .  23, 39

*Mahoney v. Doe,* 642 F.3d 1112 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . .  33

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . . . . . . . . .  55

*McGrain v. Daugherty*, 273 U.S. 135 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Moore v. U.S. House of Representatives,* 733 F.2d 946
    (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27, 28

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011). . . . . . . .  22, 34

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

\**Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . .  17, 18, 29, 30, 31, 33

*Nat'l Wrestling Coaches Ass'n v. Dep't of Education*,
    366 F.3d 930 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Newdow v. U.S. Congress*, 328 F.3d 466 (9th Cir. 2003),
    *rev'd on other grounds*, 542 U.S. 1 (2004). . . . . . . . . . . . . . . . . . . . . . . .  45

* *Nixon v. United States*, 506 U.S. 224 (1993). . . . . . . . . . . . . . . . .  11, 20, 48, 51, 52

*Page v. Shelby*, 995 F. Supp. 23 (D.D.C.), *aff'd*, 172 F.3d 920
    (D.C. Cir. 1998) (table). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 43, 46

*Powell v. McCormack*, 395 U.S. 486 (1969). . . . . . . . . . . . . . . . . . . .  49, 51, 52, 57

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23

* *Raines v. Byrd*, 521 U.S. 811 (1997). . . . . . . . . . . . .  10, 17, 23, 24, 25, 26, 27, 28

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . .  48

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . .  34

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976). . . . . . . . . . . . . . . . . . .  22

*Singleton v. Wulff*, 428 U.S. 106 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Spann v. Colonial Village*, 899 F.2d 24 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . .  32

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009). . . . . . . . . . . . . . . .  22, 34, 38

*United States v. Ballin*, 144 U.S. 1 (1892). . . . . . . . . . . . . . . . . . . . . . . .  49, 50, 51

*United States v. Booker,* 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . .  46

*United States v. Smith,* 286 U.S. 6 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . .  49, 50

*Valley Forge Christian Coll. v. Americans United for Separation*
    *of Church and State*, 454 U.S. 464 (1982). . . . . . . . . . . . . . . . . .  21, 22, 30

*Warth v. Seldin*, 422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*Yellin v. United States*, 374 U.S. 109 (1963). . . . . . . . . . . . . . . . . . . . . . . . . .  49, 50

**Constitution and Statutes**:

U.S. Const.:
    art. I, § 2, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51
    art. I, § 3, cl. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
    art. I, § 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 20
    art. I, § 5, cl. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51, 52
*    art. I, § 5, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 7, 11, 20, 47, 49
*    art. I, § 6, cl. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 21, 55
    art. I, § 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
    art. I, § 7, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52, 53
    art. II, § 2, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

**Congressional Material**:

S. 294, 110th Cong. (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44
S. 3001, 110th Cong. (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44
S. Res. 15, 113th Cong. (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
S. Res. 16, 113th Cong. (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
S. 744, 113th Cong. (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20, 46

DISCLOSE Act:
    H.R. 5175, 111th Cong. (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
    S. 3628, 111th Cong. (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

DREAM Act:
    H.R. 5281, 111th Cong. (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
    S. 3992, 111th Cong. (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*Senate Manual*, S. Doc. No. 112-1 (2011), *reprinting*:
    Senate Rule V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 6, 16
    Senate Rule XII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    Senate Rule XIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    Senate Rule XX.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    Senate Rule XXII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 16, 41

Senate Comm. on Rules and Admin., *Senate Cloture Rule:*
*Limitation of Debate in the Senate of the United States*
*and Legislative History of Paragraph 2 of Rule XXII*
*of the Standing Rules of the U.S. Senate (Cloture Rule)*,
S. Prt. No. 112-31 (Comm. Print 2011), available at
http://www.gpo.gov/fdsys/pkg/CPRT-112SPRT66046/pdf/CPRT-112SPRT66046.pdf. . . . . . . .  13, 14, 15

1 Annals of Cong. 21 (J. Gales ed. 1789). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

15 Annals of Cong. 201-03 (1806). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

55 Cong. Rec. (1917):
    19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
    45. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

95 Cong. Rec. (1949):
    2509-10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
    2724. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

105 Cong. Rec. (1959):
    8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
    494. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

121 Cong. Rec. 5650-52 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

125 Cong. Rec. (1979):
    3037-38. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
    3194. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

132 Cong. Rec. 3156-57 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

153 Cong. Rec. (2007):
    28708. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44
    28719. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

154 Cong. Rec. (2008):
    19115-16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44
    19393. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

159 Cong. Rec. S272 (daily ed. Jan. 24, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . .  15

159 Cong. Rec. S274 (daily ed. Jan. 24, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . .  15

159 Cong. Rec. S5376-77 (daily ed. June 27, 2013). . . . . . . . . . . . . . . .  20, 37, 48

**Miscellaneous**:

5 Asher Hinds, *Hinds' Precedents of the House of Representatives
of the United States* (1907). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Floyd M. Riddick and Alan S. Frumin*, Riddick's Senate Procedure:
Precedents and Practices*, S. Doc. No. 101-28
(Alan S. Frumin ed., rev. ed. 1992). . . . . . . . . . . . . . . . . . . . . . . . . .  41, 42

4 *The Encyclopedia of the United States Congress*
(Donald C. Bacon, et al., eds., 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

---

\* Cases and authorities chiefly relied upon are denoted with an asterisk.

## STATEMENT OF JURISDICTION

Plaintiffs-appellants asserted jurisdiction below under 28 U.S.C. § 1331. This Court has jurisdiction, under 28 U.S.C. § 1291, over this appeal from the December 21, 2012 Order dismissing the complaint for lack of standing and for presenting a non-justiciable political question.  Plaintiffs-appellants filed a timely notice of appeal on December 21, 2012.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

This appeal presents three issues for review:

1)  Whether the district court correctly held that plaintiffs-appellants lacked standing to challenge the procedural rules governing floor debate in the United States Senate;

2)  Whether the district court correctly held that the complaint presented a non-justiciable political question; and

3)  Whether dismissal of the complaint should be affirmed on the alternative ground that plaintiffs-appellants' claims are barred by the Speech or Debate Clause of the Constitution.[1]

---

[1]  Contrary to plaintiffs-appellants' submission, Brief of Appellants ("Appellants' Br.") at 2, this appeal does not present the question of the constitutionality of the Senate's rules for debate.  The only motion before the court below was defendants-appellees' motion to dismiss for lack of jurisdiction.  The merits of plaintiffs-appellants' constitutional claims were not before the court and were not

(continued...)

## STATUTES AND REGULATIONS

Senate Rules V and XXII, which plaintiffs-appellants challenge, are provided in an Addendum to this brief. Also provided are the Constitution's Rulemaking Clause, Art. I, § 5, cl. 2, and Speech or Debate Clause, Art. I, § 6, cl. 1.

## STANDARD OF REVIEW

The district court's grant of a motion to dismiss for lack of standing is reviewed de novo. *See Nat'l Wrestling Coaches Ass'n v. Dep't of Education*, 366 F.3d 930, 937 (D.C. Cir. 2004). The dismissal of a complaint for presenting a non-justiciable political question is also reviewed de novo. *See Lin v. United States*, 561 F.3d 502, 505 (D.C. Cir. 2009).

## STATEMENT OF THE CASE

### A.    Introduction

Plaintiffs-appellants ("Plaintiffs") brought this suit against four Senate officials alleging that Senate Rule XXII – the Cloture Rule – prevented passage of two pieces of legislation in the 111th Congress, the DREAM Act, H.R. 5281 and S. 3992, and the DISCLOSE Act, H.R. 5175 and S. 3628, that would have allegedly benefited plaintiffs. Plaintiffs assert that the Cloture Rule is unconstitutional

---

[1] (...continued)
addressed either in defendants-appellees' papers or in the court's opinion, and, therefore, are not at issue in this appeal. *See Singleton v. Wulff*, 428 U.S. 106, 119-21 (1976).

-2-

because it requires 60 votes to close debate on a matter before the Senate.

Plaintiffs' lawsuit is yet another in a series of lawsuits over the past two decades challenging the Cloture Rule. That Rule was adopted almost a century ago to provide a mechanism for closing debate over objection. From its early history, the Senate has allowed extended debate on measures before it, and, for just as long, Senators have been able to use debate to forestall Senate action on legislation. In 1917, the Senate adopted a cloture rule to provide a mechanism to close debate on a measure over the objection of one or more Senators. Throughout the almost 100 years since then, the Senate has modified the Cloture Rule, particularly the number of votes required to invoke cloture and end debate. That Rule, along with the continued use of extended debate (or "filibusters") to delay proceedings, has remained the subject of vigorous discussion inside the Senate and among the public.

The recent lawsuits challenging the Cloture Rule have been brought by persons and entities outside the Senate who are displeased with Senate proceedings. Their claims, like plaintiffs' here, asked the courts to intrude into the Senate's legislative procedures and internal deliberations, and to rewrite the Senate's rules and oversee its floor proceedings. Not surprisingly, courts uniformly have declined on jurisdictional grounds to entertain these suits, finding that they do not present a case or controversy under Article III of the Constitution.

-3-

*Judicial Watch, Inc. v. United States Senate*, 340 F. Supp. 2d 26 (D.D.C. 2004),

*aff'd*, 432 F.3d 359 (D.C. Cir. 2005); *Page v. Shelby*, 995 F. Supp. 23, 29

(D.D.C.), *aff'd*, 172 F.3d 920 (D.C. Cir. 1998) (table).  Specifically, the courts in

those cases held that plaintiffs lacked standing because they could not establish

that they were injured by the Cloture Rule nor that a court could redress their

claimed injuries.  The district court similarly concluded that plaintiffs here lack

standing and also that plaintiffs' claims present a non-justiciable political

question, and dismissed the complaint for lack of jurisdiction.  Memorandum

Opinion ("Mem. Op.") at 2-3, JA67-68.

This Court should likewise reject plaintiffs' attempt to insert the Judiciary

into the Senate's internal proceedings and should affirm the district court's

judgment dismissing the complaint.  Alternatively, the dismissal should be

affirmed because plaintiffs' claims are barred by the Speech or Debate Clause of

the Constitution.  Under our system of separated powers, questions regarding the

appropriate procedures for considering legislation and regulating debate, including

the rules for cloture, should be resolved by the Senate, not the courts.

### B.    Plaintiffs' Allegations

The eight plaintiffs fall into three groups: an organizational plaintiff

(Common Cause), four U.S. Representatives, and three private individuals.

Plaintiff Common Cause is "a non-profit corporation" formed "to serve as a grass

roots 'citizens lobby' to promote the adoption of campaign finance, disclosure and other election reform legislation by Congress and by state and local governments." Compl. ¶ 9(A), JA20.  Plaintiffs John Lewis, Michael Michaud, Hank Johnson, and Keith Ellison (the "Member plaintiffs"), are Members of the House of Representatives representing Georgia, Maine, Georgia, and Minnesota, respectively.  *Id.* ¶ 9(B), JA21.  Plaintiffs Erika Andiola, Celso Mireles, and Caesar Vargas (the "DREAM Act plaintiffs") allege that they were born in Mexico and brought to the United States as children, and subsequently graduated from college and obtained employment.  *Id.* ¶ 9(C), JA22-25.

Plaintiffs allege that the Senate Cloture Rule "replaces majority rule with rule by the minority by requiring the affirmative votes of 60 senators on a motion for cloture before the Senate is allowed to even *debate* or vote on" measures before it.  *Id.* ¶ 2, JA15.  Plaintiffs allege that "[b]oth political parties have used Rule XXII when they were in the minority in the Senate to prevent legislation and appointments proposed by the opposing party from being debated or voted on by the Senate."  *Id.* ¶ 4, JA16.  And, even after cloture is invoked, the Cloture Rule permits further delay by allowing "30 additional hours of debate."  *Id.* ¶ 15, JA32. Plaintiffs assert that the "filibuster has been used with increasing frequency," *id.* ¶¶ 49-50, JA47; "[a]ctual or threatened filibusters . . . have become so common that it is now virtually impossible as a practical matter for the majority in the

Senate to pass a significant piece of legislation or to confirm many presidential nominees without the 60 votes required to invoke cloture under Rule XXII." *Id.* ¶ 18, JA33. Plaintiffs allege that because invoking cloture is "time-consuming and cumbersome," the mere threat of a "filibuster" can forestall consideration of a measure. *Id.* ¶ 15, JA32.

Furthermore, because Senate Rule V provides that Senate rules continue from one Congress to the next, and because cloture on resolutions to amend Senate rules requires the concurrence of two-thirds of Senators present and voting, plaintiffs assert that "the combination of Rule V and Rule XXII has made it virtually impossible for the majority in the Senate to amend the rules of the Senate to prevent" a minority "from obstructing the business of the Senate by filibustering." *Id.* ¶ 19, JA33-34.

Each group of plaintiffs alleges it has suffered injury from the Cloture Rule's having prevented the Senate from closing debate and passing two pieces of legislation – the DISCLOSE Act, a campaign finance reform bill, and the DREAM Act, an immigration reform bill. Common Cause alleges that a Senate minority used the rules permitting extended debate to prevent passage of the DISCLOSE Act in the 111th Congress, wasting "time, effort and resources" Common Cause spent lobbying for the Act's passage, *id.* ¶ 9(D)(1)(c), JA26, and forcing it "to devote additional time and resources to support the enactment of a new

-6-

DISCLOSE Act." *Id.* Common Cause also alleges it has been "forced to divert staff, time and resources that could have been used to support other election reforms to combatting the effects of secret expenditures by Super PACs and others in federal elections that would have been prohibited by the DISCLOSE Act." *Id.*

The House Member plaintiffs allege that "a minority of senators" used extended debate "to nullify [their] votes . . . in favor of numerous bills and resolutions that passed the House . . . and would have passed the Senate and become law but for Rule XXII." *Id.* ¶ 9(D)(2)(a), JA28. The DREAM Act plaintiffs allege that they "ha[ve] been denied a path to United States citizenship" and are "subject to the risk of deportation," because "[a] minority of the Senate" used the Cloture Rule to block passage of the DREAM Act. *Id.* ¶ 9(E)(1), JA29.

Plaintiffs' complaint asserts that the Cloture Rule violates numerous constitutional provisions or principles, including: the Senate's rule-making power, Art. I, § 5, cl. 2 (Compl. ¶¶ 57-59, JA50-51); the Quorum Clause, Art. 1, § 5; the Presentment Clause, Art. I, § 7; "the exclusive list of exceptions" to majority rule; the Vice President's power to vote when the Senate is "equally divided," Art. I, § 3, cl. 4; the Appointments Clause, Art. II, § 2, cl. 2; the "equal representation of each state in the Senate" resulting from "the finely wrought and exhaustively considered balance of the Great Compromise" on representation in the Congress (*Id.* ¶¶ 60-70, JA53-58); "the fundamental constitutional principle that prohibits

one Congress (or one house of Congress) from binding its successors"; and the Senate's "power" "to adopt or amend its rules by majority vote."  (*Id*. ¶¶ 71-75, JA58-59).

For relief, plaintiffs ask this Court to declare unconstitutional the Cloture Rule's requirement of 60 votes to invoke cloture on most measures (and a two-thirds vote for cloture on amending Senate rules), to sever that language from the Rule, and to declare that "a vote of a simple majority of a quorum" is sufficient to invoke cloture.  *Id*. at 50, JA61.  Alternatively, plaintiffs request that the Court declare Rule V unconstitutional and that debate on amendments to Senate rules may be closed by majority vote.  *Id*. at 51, JA62.

### C.    Proceedings Below

Plaintiffs filed this suit on May 14, 2012.  Defendants moved to dismiss the complaint for lack of jurisdiction.  Defendants' Motion to Dismiss [JA 64].  The court heard oral argument on December 10, and, on December 21, issued a Memorandum Opinion [JA 66] and Order [JA 113] granting the motion and dismissing the complaint for lack of standing and for presenting a non-justiciable political question.

### D.    The District Court's Decision

The district court held that plaintiffs lacked standing and their complaint presented a non-justiciable political question.  As to standing, the court rejected

-8-

plaintiffs' assertion of "procedural standing" because plaintiffs could not identify any "authority for the proposition that an individual has a 'procedural right' to any particular form of congressional consideration or debate on a bill." Mem. Op. at 17, JA82. Moreover, the court explained, "Plaintiffs do not point to a concrete interest, particular to these Plaintiffs, that Article I of the Constitution [the locus of plaintiffs' claimed 'procedural right'] was designed to protect." *Id.* at 21, JA86.

The district court next held that none of plaintiffs demonstrated the necessary injury-in-fact, causation, and redressability for Article III standing. As to Common Cause and the DREAM Act plaintiffs, the court explained that "there is no existing or certainly impending opportunity from which Plaintiffs could benefit, but for the Cloture Rule," as plaintiffs cannot demonstrate "that the [DREAM or DISCLOSE Acts] will ever be enacted by the House and the Senate and signed by the President." *Id.* at 23, JA88. Accordingly, their alleged injury from the Senate's failure to pass the DISCLOSE and DREAM Acts was "hypothetical, rather than concrete." *Id.*

The court further explained that Common Cause and the DREAM Act plaintiffs "failed to demonstrate that the DREAM and DISCLOSE Acts would have *passed* but for the Cloture Rule," or that "they necessarily would have benefitted from those Acts," *id.* at 25-26, JA 90-91, and thus cannot establish the causation prong of standing. "The connection between the Senate's debate over

proposed legislation, or lack thereof, and Plaintiffs' inability to benefit from the opportunities that legislation would have offered is simply too tenuous to support standing." *Id.* at 26, JA91. Finally, the court found that plaintiffs' alleged injuries are not likely to be redressed by a favorable decision because, even if the court could strike the Cloture Rule, that action would not cause the failed House bills to become law and, thus, "would not provide them with the opportunity to benefit from the DREAM Act or the DISCLOSE Act." *Id.* Nor would a judgment holding the Cloture Rule unconstitutional make it "likely" that the legislation would be enacted. "The Court is not in a position . . . to determine or predict what action the Senate would take in a final vote on either proposed bill, much less what action would be taken by the House of Representatives and the President." *Id.* at 27, JA92.

The district court held that the House Member plaintiffs lacked standing under *Raines v. Byrd*, 521 U.S. 811 (1997). The court rejected the Members' claim that they have standing under *Coleman v. Miller*, 307 U.S. 433 (1939), because their votes for the DREAM and DISCLOSE Acts were nullified when the Senate failed to close debate and pass those bills. *Id.* at 33-35, JA98-100. The "Member Plaintiffs' votes for the DREAM and DISCLOSE Acts were never treated as if they did not pass. Rather, the bills were treated as if they passed the House, but the Senate then failed to debate or pass them." *Id.* at 34, JA99 (citing

-10-

Defs.' Reply Memorandum at 8-9). Thus, the Members' votes were not subject to "complete nullification." *Id*. at 35, JA100. Finally, the court noted that separation-of-powers concerns counsel against legislative standing in this case. *Id*. at 35-36, JA100-01.

In addition to lack of standing, the court dismissed the complaint for presenting a non-justiciable political question under three of the factors set forth in *Baker v. Carr*, 369 U.S. 186, 217 (1962). Applying *Nixon v. United States*, 506 U.S. 224 (1993), the court concluded plaintiffs' claims involve a matter textually committed by the Constitution to the Senate in the Rulemaking Clause, art. I, § 5, cl. 2, and no separate, express provision of the Constitution limits the Senate's discretion in structuring debate. Mem. Op. at 39-41, JA104-06. The court also noted the lack of judicially manageable standards for reviewing the Senate's rules governing debate or determining the appropriate length of debate on any given measure. *Id*. at 43-44, JA108-09. Finally, the court found that reaching the merits of plaintiffs' claims would "require an invasion into internal Senate processes at the heart of the Senate's constitutional prerogatives as a House of Congress, and would thus express a lack of respect for the Senate as a coordinate branch of government." *Id*. at 45-46, JA110-11.

## STATEMENT OF FACTS AND BACKGROUND

### The Senate's History of Floor Debate and the Cloture Rule

In the Senate, legislation, nominations, resolutions, and most other business are subject to extended debate, including "filibusters," which are commonly understood as attempts by one or more Senators to prevent or forestall the Senate from voting on pending matters by continuing to debate them. Although it is often difficult to identify when extended debate becomes a filibuster, the use of prolonged debate to prevent final action on a matter has long been part of Senate practice.[2] Throughout its history, the Senate has wrestled with the merits and shortcomings of allowing unlimited debate and has repeatedly, over time, including in the current Congress, adjusted the procedures it deems fitting for regulating debate.

*1. Early History of Senate Debate and Adoption of a Cloture Rule*

From 1789 to 1806, Senate procedures provided for a motion for the "previous question," which permitted a majority to determine whether matters on the Senate's calendar should be postponed or considered. 1 Annals of Cong. 21 (J. Gales ed. 1789) (providing "if the nays prevail, the main question shall not then be

---

[2]   Determining whether any particular instance of extended debate constitutes a filibuster is problematic because, by definition, what constitutes a filibuster depends, at least in part, on a judgment that the motivation of the debating Senators is to preclude Senate action on the matter.

put"). The Senate abandoned that rule in 1806. 15 Annals of Cong. 201-03 (1806). From 1806 to 1917, there was no mechanism for closing debate over the objection of a Member who wished to speak. The Senate followed the practice that a question remains open until every Member who so desires has spoken.

By the early twentieth century, the increased intensity, frequency, and success of "filibusters" heightened demands for reform of Senate rules for debate, and, in 1917, the Senate adopted a rule for closing debate over the objection of a Senator – a "Cloture Rule." *See* 55 Cong. Rec. 45 (1917).[3] That rule provided that whenever 16 Senators moved to close debate on any pending measure, the presiding officer would, after a two-day hiatus, submit to the Senate, without debate, the question, "Is it the sense of the Senate that the debate shall be brought to a close?" If the question was determined in the affirmative by two-thirds of those voting, the measure became the pending business to the exclusion of all other business until the Senate disposed of it. Debate would not be cut off immediately, but would be limited to one hour for each Member. The resolution

---

[3] The new cloture rule applied only to "pending measures" and not to motions to amend the rules, procedural votes, or nominations. Senate Comm. on Rules and Admin., *Senate Cloture Rule: Limitation of Debate in the Senate of the United States and Legislative History of Paragraph 2 of Rule XXII of the Standing Rules of the U.S. Senate (Cloture Rule)*, S. Prt. No. 112-31, at 17 (Comm. Print 2011) [hereinafter "Rules Committee, *Cloture Rule*"]*, available at* http://www.gpo.gov/fdsys/pkg/CPRT-112SPRT66046/pdf/CPRT-112SPRT66046.pdf.

also restricted amendments after cloture and prohibited dilatory motions and non-germane amendments. *See* 55 Cong. Rec. 19 (1917); Rules Committee, *Cloture Rule* at 185-86.

### 2. Changes in the Cloture Rule Since Its Adoption[4]

The Cloture Rule, however, did not end the use of dilatory tactics, and the Senate has considered and made numerous changes to the rule since its adoption. Although cloture was invoked four times between 1917 and 1927, *see* Rules Committee, *Cloture Rule* at 115, the rule could be circumvented simply by filibustering a procedural motion. *See id.* at 20. In 1949, the Senate extended the Cloture Rule to motions and other pending matters and increased the votes required to invoke cloture from two-thirds of those voting to two-thirds of total Senate membership, while continuing to exclude from the Cloture Rule motions to proceed to resolutions to amend Senate rules. *See id.* at 20-21, 191-92; 95 Cong. Rec. 2509-10, 2724 (1949).

The Senate modified the Cloture Rule again in 1959, reducing the votes required to invoke cloture from two-thirds of Senate membership back to the original requirement of two-thirds of Members present and voting. *See* Rules Committee, *Cloture Rule* at 24, 197. In addition, motions to proceed to

---

[4] A full discussion of proposals to modify the Cloture Rule or otherwise constrain debate in the Senate from 1917 through 2008 appears in Rules Committee, *Cloture Rule* at 17-41.

resolutions to amend Senate rules were subjected to cloture for the first time, *see id.*, and the resolution codified the Senate's understanding, since the First Congress, that Senate rules continue from one Congress to the next. *See id.* at 24-25, 196-97; 105 Cong. Rec. 8, 494 (1959).

The Cloture Rule was not amended again until 1975, when the number of votes to invoke cloture was reduced to three-fifths of Senate membership, *see* 121 Cong. Rec. 5650-52 (1975), though the number of votes to invoke cloture on resolutions to change Senate rules remained two-thirds of those present and voting. The votes needed for cloture has remained unchanged since, although the Senate has altered the number of amendments permitted and the time allotted for debate after cloture is invoked, *see* 125 Cong. Rec. 3037-38, 3194 (1979) (capping debate post-cloture at 100 hours, but guaranteeing each Senator ten minutes); 132 Cong. Rec. 3156-57 (1986) (lowering cap on post-cloture debate to 30 hours)[5].

In the current Congress, the Senate further altered the Cloture Rule to provide alternative mechanisms for limiting debate on motions to proceed and motions authorizing conference committees with the House. *See* S. Res. 15, 113th Cong., 159 Cong. Rec. S272 (providing for a standing order applicable to 113th Congress); S. Res. 16, 113th Cong., 159 Cong. Rec. S274 (daily ed. Jan. 24, 2013)

---

[5] Post-cloture debate on nominations was lowered to eight hours for the 113th Congress. S. Res. 15, 113th Cong., 159 Cong. Rec. S272 (daily ed. Jan. 24, 2013).

(amending Senate Rule XXII).  Debate has continued in the Senate over proposals to modify the Cloture Rule further.

### 3. Rule V and the Continuity of Senate Rules

From the First Congress onward, the Senate's practice has been that its rules remain in effect from Congress to Congress and need not be readopted at the beginning of each Congress.  This practice was formally codified in 1959, and is found in Senate Rule V: "The rules of the Senate shall continue from one Congress to the next Congress unless they are changed as provided in these rules." In contrast, the House of Representatives adopts its rules anew at the beginning of each Congress.  *See* 5 Asher Hinds, *Hinds' Precedents of the House of Representatives of the United States*, § 6742, at 881 (1907).  This difference is attributable to the fact that the Senate is considered a "continuing body";[6] Senate committees, officers, and rules – though not bills and nominations – carry over from one Congress to the next.

---

[6] *McGrain v. Daugherty*, 273 U.S. 135, 181 (1927); *see also* 4 *The Encyclopedia of the U.S. Congress* 1791 (Donald C. Bacon, et al., eds., 1995) ("Because only a third of the Senate is newly elected every two years, it is considered a continuing body whose rules require no readoption from one Congress to the next.").

## SUMMARY OF ARGUMENT

The district court correctly held that plaintiffs lacked Article III standing and their complaint presented a non-justiciable political question, and the dismissal should be affirmed on those grounds. The dismissal may also be affirmed on the alternative ground that plaintiffs' claims are barred by the Speech or Debate Clause.

1.    None of the plaintiffs satisfy the requirements for Article III standing. First, plaintiffs do not allege a concrete and particularized injury-in-fact. The House Member plaintiffs' allegations of injury-in-fact as Members of Congress are foreclosed by the Supreme Court's decision in *Raines v. Byrd*, 521 U.S. at 825-29. The Senate's failure to pass legislation the Member plaintiffs supported in the House does not constitute a "nullification" of their votes under the "narrow rule announced in *Coleman v. Miller*." *Chenoweth v. Clinton*, 181 F.3d 112, 116 (D.C. Cir. 1999).

Common Cause's allegations that the Senate's failure to pass the DISCLOSE Act frustrated its objective of campaign finance reform, Appellants' Br. at 36, constitute a "mere 'setback to the organization's abstract social interests,'" which is "inadequate" to establish injury-in-fact. *Nat'l Treasury Emps. Union v. United States* ["*NTEU*"], 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Common Cause's

-17-

allegation that it wasted resources working for passage of the DISCLOSE Act is the type of alleged harm to an organization's lobbying activities that this Court has found insufficient for standing. *See Center for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (D.C. Circuit "has not found standing when the only 'injury' arises from the effect [of the challenged action] on the organization[']s lobbying activities."); *NTEU*, 101 F.3d at 1430. Common Cause's claim that it expended resources to uncover lawful campaign spending that the DISCLOSE Act would have required be disclosed, fails to constitute an organizational injury under *Havens Realty*, 455 U.S. 363. Finally, Common Cause's assertion of associational standing on behalf of its members' informational interests was abandoned below and, even if it could be raised here, does not constitute an informational injury for standing purposes.

The DREAM Act plaintiffs' assertion that they have been deprived of the opportunity to benefit from passage of that Act fails to state an injury, as there is no concrete and particularized interest in having Congress pass legislation favorable to plaintiffs.

Furthermore, plaintiffs' attempt to characterize their injury as a "procedural injury" under Article I was correctly rejected by the district court. Not only does the concept of "procedural injury" have no application in the context of a constitutional challenge to internal congressional legislative procedures, but

-18-

plaintiffs fail to identify either a precise procedural right conferred by Article I or a concrete interest, particular to plaintiffs, that Article I was designed to protect.

In addition to lacking injury-in-fact, none of plaintiffs satisfy the causation or redressability prongs of standing. First, neither the complaint nor appellants' brief addresses how plaintiffs' alleged injuries are fairly traceable to the actions of the Senate officers named as defendants, none of whom can alter the Senate's rules nor participate in a "filibuster." Furthermore, it is inherently speculative to link any particular legislative outcome to internal Senate debate procedures, which represent but one part of the legislative process – a process that requires proposed legislation to pass the Senate and House in identical form and be signed by the President (or, if vetoed, receive a two-thirds override vote of both Houses). Such a tenuous link between failure to close Senate debate and plaintiffs' alleged injuries cannot support standing.

Plaintiffs are also unable to demonstrate that a favorable decision could redress their alleged injuries. First, any action to prevent Senate debate on a matter – such as ordering the Senate to close debate on a bill or requiring cloture by majority vote – would require a court to interfere in the Senate's floor proceedings, raising grave separation-of-powers concerns. Merely limiting the remedy to declaratory relief striking part of the Cloture Rule, as plaintiffs request, is no less intrusive as it would equally usurp the Senate's power to "determine the

-19-

Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2. *See Judicial Watch*, 432 F.3d at 361 ("[A] request for judicial substitution of a simple majority rule for cloture on judicial nominations" constitutes a "judicial rewrite" of Senate rules that "would obviously raise the most acute problems, given the Senate's independence in determining the rules of its proceedings and the novelty of judicial interference with such rules."). And, none of this relief would redress alleged injuries from failure to pass the DREAM or DISCLOSE Acts in the 111th Congress, as it would not – and a court could not – require the Senate to take up and pass expired legislation benefiting plaintiffs.[7]

2.     The court below correctly held that plaintiffs' complaint presents a non-justiciable political question under three of the factors recognized in *Baker v. Carr*, 369 U.S. at 217. First, the Constitution commits to the Senate the authority to "determine the Rules of its Proceedings," Art. I, § 5, including how much time to spend debating a matter and when to bring pending business to a vote. *Cf. Nixon v. United States*, 506 U.S. 224, 230-38 (1993) (non-justiciable textual commitment to Senate of "sole Power to try all Impeachments"). Second, courts

---

[7] While this appeal has been pending, the Senate passed S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act, section 2103 of which is the "DREAM Act," providing authority for the Secretary of Homeland Security to adjust the status of "certain aliens who entered the United States as children." 159 Cong. Rec. S5376-77 (daily ed. June 27, 2013). That bill is pending in the House.

lack manageable standards for judging how much debate to allow on any measure or the proper procedures for regulating debate and bringing a measure to a vote. Third, judicial consideration of plaintiffs' claims would require this Court to intrude into and oversee the Senate's internal deliberations, thereby showing a lack of respect due a coequal branch.

3.    Affirmance is also warranted on the alternative ground presented to, but not resolved by, the district court – that the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, bars this suit.  Under that Clause, Senate officers are absolutely immune from suit for any actions assisting the Senate in carrying out debate under its rules because such acts fall squarely within the sphere of legitimate legislative activity protected from questioning by the Clause.  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501-02 (1975).

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS LACK STANDING

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'"  *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982).  "[T]he 'case or controversy' requirement," the Supreme Court explained, "defines with respect to the Judicial Branch the idea of separation of powers on

which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750

(1984). "'No principle is more fundamental to the judiciary's proper role in our

system of government than the constitutional limitation of federal-court

jurisdiction to actual cases or controversies.'" *Simon v. E. Ky. Welfare Rights*

*Org.*, 426 U.S. 26, 37 (1976).

Standing to bring suit is an essential part of any case or controversy. *See*

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011). Standing

doctrine requires a litigant to "allege[ ] such a personal stake in the outcome of the

controversy as to warrant *his* invocation of federal-court jurisdiction," *Chamber of*

*Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (quoting *Summers v. Earth*

*Island Inst.*, 555 U.S. 488, 493 (2009)), ensuring "that the Judicial Branch does

not perform functions assigned to the Legislative or Executive Branch and 'that

the judiciary is the proper branch of government to hear the dispute.'" *Public*

*Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C.

Cir. 2007) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir.

1996) (en banc)). Standing, thus, is not a mere pleading hurdle, but "a part of the

basic charter promulgated by the Framers of the Constitution," *Valley Forge*, 454

U.S. at 476, and "serves to prevent the judicial process from being used to usurp

the powers of the political branches." *Clapper v. Amnesty Intern. USA*, 133 S. Ct.

1138, 1146 (2013). Furthermore, because "'the law of Art. III standing is built on

a single basic idea – the idea of separation of powers,'" *Raines*, 521 U.S. at 820 (quoting *Allen*, 468 U.S. at 752), the standing inquiry is "especially rigorous" in cases where "reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 819-20.

"The 'party invoking federal jurisdiction bears the burden of establishing the[] elements [of standing].'" *Public Citizen*, 489 F.3d at 1289 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  To meet this burden, a plaintiff must satisfy all three elements that form the "irreducible constitutional minimum of standing" under Article III: (1) the plaintiff "ha[s] suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical;" (2) the injury was caused by, or is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (internal quotation marks and citations omitted); *accord Center for Law and Educ.*, 396 F.3d at 1157.

## A.  Plaintiffs' Allegations Do Not Establish Injury-In-Fact

Each group of plaintiffs alleges different injuries in this case – none are sufficient for standing.

1.      **The House Member Plaintiffs Did Not Suffer an Injury in Their Capacity as Members of Congress**.

The House Member plaintiffs allege injury in their official capacities as Representatives from the Senate's failure to close debate and vote on legislation – the DISCLOSE and DREAM Acts – the House passed and sent to the Senate in the 111th Congress.  By preventing final passage, the Member plaintiffs argue, the Cloture Rule "resulted in the unconstitutional nullification of the effectiveness of their votes" for those bills.  Appellants' Br. at 20.

As the district court correctly held, standing based on this claim of injury is foreclosed by *Raines v. Byrd*, 521 U.S. 811.  Mem. Op. at 32-35, JA97-100.  In *Raines*, Senators and Representatives who had voted against the Line Item Veto Act brought suit challenging the Act's constitutionality.  They claimed standing "in their official capacities" because, they asserted, the Act "alter[ed] the legal and practical effect of all votes they may cast on bills" subject to the line-item veto, "divest[ed] [them] of their constitutional role in the repeal of legislation," and "alter[ed] the constitutional balance of powers between the Legislative and Executive Branches."  521 U.S. at 816.  The Supreme Court rejected these bases for standing, finding that the Member plaintiffs lacked "concrete injury" because their asserted harm was "based on a loss of political power," and not the loss of "any private right."  *Id*. at 821.   The Court noted that a harm to Members in their

-24-

official capacity was not a personal injury to them, but rather a harm that "runs (in a sense) with the Member's seat, a seat which the Member holds . . . as trustee for his constituents, not as a prerogative of personal power." *Id*. Accordingly, the Court concluded that Members alleging injury from the diminution of the "'meaning' and 'effectiveness' of their vote," *id*. at 825, lack standing because such an injury is "wholly abstract and widely dispersed," and "contrary to historical experience." *Id*. at 829.

The Supreme Court in *Raines* recognized a possible exception to this prohibition on legislator standing where the Member's injury falls within the "narrow rule announced in *Coleman v. Miller*." *Chenoweth*, 181 F.3d at 116. In *Coleman*, 20 of Kansas' 40 state senators voted against ratifying a proposed Child Labor Amendment to the Federal Constitution, and such an evenly divided vote would have meant the amendment was not ratified by the state. *Raines*, 521 U.S. at 822 (citing *Coleman*, 307 U.S. at 436-37). However, the Lieutenant Governor, who presided in the Kansas Senate, cast a tie-breaking vote for ratification, and the amendment was deemed ratified after the Kansas House passed it. *Coleman*, 307 U.S. at 436. Twenty-one state senators and three state representatives sued to have state officials recognize that the legislature had not ratified the amendment because of the deadlocked vote in the state senate. *Id*.; *Raines*, 521 U.S. at 822. The Supreme Court in *Coleman* held that the 20 state senators who voted against

-25-

the amendment had standing based on the nullification of their votes against ratification.  As the *Raines* court explained, however, *Coleman*'s holding does not support standing for legislators generally, but rather "stands (at most[]) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823.[8]

The district court correctly held that the House Member plaintiffs' allegation that the Senate nullified their votes when it failed to close debate and pass the DREAM and DISCLOSE Acts did not constitute an injury under *Coleman*.  Mem. Op. at 28-35, JA93-100.  As this Court explained, the Supreme Court "used nullify to mean treating a vote that did not pass as if it had, or vice versa." *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000).  These four House Members voted in favor of the DREAM and DISCLOSE Acts, both of which passed the House.  No official in the Senate treated the legislation as if it did not pass the House; rather, the Senate simply failed to pass the legislation itself.  No vote "nullification" occurred.  As the court below recognized, "[i]nterpreting the

---

[8]   The Supreme Court noted, without deciding the issue, that the *Coleman* exception may not apply to cases brought by federal legislators because "the separation-of-powers concerns present in such a suit were not present in *Coleman*," which involved state legislators suing in state court. *Raines*, 521 U.S. at 824 n.8.

[vote nullification] exception in the way Plaintiffs urge . . . would transform it from a narrow exception into a broader one, potentially allowing members of either House of Congress to sue the other for failure to pass a bill the other House supported." Mem. Op. at 35, JA100.

The Member Plaintiffs argue that the district court erred in holding that they lacked injury-in-fact as legislators because it failed to credit plaintiffs' reliance on two pre-*Raines* D.C. Circuit cases, *Moore v. U.S. House of Representatives,* 733 F.2d 946 (D.C. Cir. 1984), and *Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1974), that had found standing for Members of Congress. However, as this Circuit has recognized, those cases' broad view of legislator standing was undermined by the Supreme Court's decision in *Raines*. *See Chenoweth*, 181 F.3d at 115-17. The Member plaintiffs dispute this conclusion by pointing to the statement in *Chenoweth* that "*Raines* [n]otwithstanding, *Moore* and *Kennedy* may remain good law[.]" Appellants' Br. at 24. Yet, this brief quotation, taken out of context, completely misconstrues this Court's explanation of *Raines'* effect on prior Circuit precedent. In fact, *Chenoweth* concluded "that *Raines* leaves no room for the broad theory of legislative standing that we adopted in *Moore* and *Kennedy*." *Chenoweth*, 181 F.3d at 117 n.* The Court explained:

> Against the backdrop of *Raines* and our own decisions after
> *Goldwate*r, the futility of the present Representatives' claim is
> apparent. As the plaintiffs point out, the injury they allegedly suffered

when the President issued Executive Order 13,061-a dilution of their
authority as legislators-is precisely the harm we held in *Moore* and
*Kennedy* to be cognizable under Article III.  It is also, however,
identical to the injury the Court in *Raines* deprecated as "widely
dispersed" and "abstract." . . . Consequently, *the portions of our
legislative standing cases upon which the current plaintiffs rely are
untenable in the light of* Raines.

*          *          *

Raines *notwithstanding,* Moore *and* Kennedy *may remain good
law, in part, but not in any way that is helpful to the plaintiff
Representatives.* Whatever *Moore* gives the Representatives under the
rubric of standing, it takes away as a matter of equitable discretion. It
is uncontested that the Congress could terminate the AHRI were a
sufficient number in each House so inclined.  Because the parties'
dispute is therefore fully susceptible to political resolution, we would,
applying *Moore*, dismiss the complaint to avoid "meddl[ing] in the
internal affairs of the legislative branch." 733 F.2d at 956.  Applying
*Raines*, we would reach the same conclusion.  *Raines*, therefore, may
not overrule *Moore* so much as require us to merge our separation of
powers and standing analyses.  In citing *Moore*, of course, the
Representatives are not asking us to do that; instead, they would have
us simply ignore half of that opinion.

As for *Kennedy*, it may survive as a peculiar application of the
narrow rule announced in *Coleman v. Miller.*

*Id*. at 115-16 (emphasis added).[9]

Accordingly, plaintiffs' reliance on *Moore* and *Kennedy* for legislator

standing is misplaced after *Raines*.  The district court correctly relied on *Raines*

instead of those prior cases in holding that the Member plaintiffs lacked injury-in-

---

[9]  Indeed, the dissent in *Chenoweth* understood that the Court's opinion "decid[ed]
that *Raines* essentially overrules the theory of legislative standing recognized in
*Kennedy* and *Moore*[.]"  *Chenoweth*, 118 F.3d at 117 (Tatel, J., dissenting).

fact as legislators.

**2.    The District Court Correctly Held That Common Cause and the DREAM Act Plaintiffs Do Not Allege an Injury-in-Fact**

**a.    Common Cause lacks injury-in-fact**

Common Cause asserts that the Senate's failure to close debate and pass the DISCLOSE Act harmed it as an organization in three interrelated ways: (1) it "prevented" Common Cause from achieving one of its major objectives: campaign finance reform"; (2) it "wasted" staff time and resources used to draft and lobby for passage of the DISCLOSE Act; and (3) it "forced" Common Cause "to devote substantial resources to uncover, identify, and expose the identities of the corporations, unions, and wealthy individuals who spent millions to influence the outcome of the 2008, 2010, and 2012 elections." Appellants' Br. at 36-37. None of these alleged harms constitutes injury-in-fact.[10]

First, as this Circuit has explained, to establish injury-in-fact an organization "must demonstrate that it has suffered 'concrete and demonstrable injury to [its] activities.'" *NTEU*, 101 F.3d at 1427. "A mere 'setback to the organization's abstract social interests' is inadequate[.]" *Id.* (quoting *Havens*

---

[10]    An organization suing on its own behalf, like any plaintiff, must establish the three prerequisites of Article III standing: (1) concrete injury (2) fairly traceable to the alleged illegal action and (3) likely to be redressed by a favorable decision. *NTEU*, 101 F.3d at 1427.

*Realty*, 455 U.S. at 379); *see also Equal Rights Center v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Common Cause's allegation that it was "prevented . . . from achieving one of its major objectives: campaign finance reform," Appellants' Br. at 36, does not constitute a concrete injury sufficient for standing. As this Circuit has explained, "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Center for Law and Educ.*, 396 F.3d at 1161-62 (quoting *NTEU*, 101 F.3d at 1429). Common Cause's concern over Congress' failure to pass campaign finance reform is nothing more than "one of those 'abstract questions of wide public significance' which amount to 'generalized grievances'. . . most appropriately addressed in the representative branches[.]" *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 267 (3ᵈ Cir. 2009) (quoting *Valley Forge*, 454 U.S. at 474-75).

Common Cause's second alleged harm – that the "significant" time and "resources" it devoted "to drafting the DISCLOSE Act and building public support for its passage" were "wasted" when the legislation failed to pass the Senate – is nothing more than a claim that Common Cause expended resources lobbying unsuccessfully for the DISCLOSE Act. Yet, this Circuit "has not found standing when the only 'injury' arises from the effect [of the challenged action] on the organization's lobbying activities." *Center for Law and Educ.*, 396 F.3d at 1161; *see also NTEU*, 101 F.3d at 1430 (organization challenging Line Item Veto

-30-

Act lacked standing based on allegations it would have to expend more resources on lobbying because of power Act granted President); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1431, 1434 (D.C. Cir. 1995) (rejecting standing where organization alleged that tax law provision frustrated its objectives and required it to expend substantial funds lobbying for repeal).[11]

Common Cause's claim that it was forced to "devote substantial resources to uncover, identify, and expose the identities of the corporations, unions, and wealthy individuals who spent millions to influence the outcome of the 2008, 2010, and 2012 elections," Appellants' Br. at 37, similarly fails to establish injury-in-fact. That conclusory assertion provides no detail as to what funds were diverted, how much, when, and from which activities, and thus, fails to establish with particularity a "'concrete and demonstrable injury to the organization's activities – with [a] consequent drain on the organization's resources.'" *Common Cause v. FEC*, 108 F.3d 413, 417 (D.C. Cir. 1997) (quoting *NTEU*, 68 F.3d at

---

[11] This Circuit's recent decision in *Am. Society for the Prevention of Cruelty to Animals v. Feld Entertainment*, 659 F.3d 13 (D.C. Cir. 2011), is not to the contrary. In that case, the Court stated that "whether injury to an organization's advocacy supports *Havens* [*Realty*, 455 U.S. 363] standing remains an open question." *Id.* at 27. However, the Court was not addressing standing based on lobbying expenses as in *Center for Law and Education*, *NTEU*, or *National Taxpayers Union*, but rather the distinct question whether the challenged conduct (using bullhooks and chains on circus elephants) undermined the organization's public education efforts (regarding cruelty to elephants from such implements), requiring it to augment those efforts.

1433 (alteration in original)).

Furthermore, simply alleging that the organization moved funds between activities does not establish injury-in-fact. Any harm from voluntarily shifting resources results from the organization's own "budgetary choices" and, by itself, does not demonstrate an injury for standing. *Fair Employment Council v. BMC Marketing Corp.*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994) ("The [Supreme] Court [in *Havens Realty*] . . . did not base standing on the diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the organization's programs."). In addition, unlike in *Havens Realty,* 455 U.S. 363*,* where the organization expended funds to combat *illegal* activity, the activity that Common Cause is allegedly devoting resources to combat – undisclosed expenditures by Super PACs – is not claimed to be unlawful. *See Spann v. Colonial Village*, 899 F.2d 24, 27 (D.C. Cir. 1990) ("*Havens* makes clear, however, that an organization establishes Article III injury if it alleges that purportedly *illegal* action increases the resources the group must devote to programs independent of its suit challenging the action.") (emphasis added).

Thus, none of Common Cause's alleged harms constitutes injury-in-fact to the organization. Nor does Common Cause show, as the district court noted, any "direct conflict between the allegedly illegal conduct – use of the Cloture Rule –

and [Common Cause's] mission – encouraging transparency in elections," Mem.

Op. at 24 n.8, JA89, as required for an organization to establish injury-in-fact.

*NTEU*, 101 F.3d at 1430 ("[I]n those cases where governmental action is

challenged, if the government's conduct does not directly conflict with the

organization's mission, the alleged injury to the organization likely will be one

that is shared by a large class of citizens and thus insufficient to establish injury in

fact.") (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

Common Cause also asserts associational standing on behalf of its members.

Appellants' Br. at 37-39.  Yet, as the district court found, by failing to respond to

defendants' challenge to Common Cause's associational standing in the motion to

dismiss, "Plaintiffs have conceded that they do not have associational standing."

Mem. Op. at 22 n.6, JA87 (citing *Hopkins v. Women's Div., Gen. Bd. of Global

Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 Fed. App'x 8 (D.C.

Cir. 2004)).  Having conceded it below, plaintiffs cannot raise this ground on

appeal.  *See Mahoney v. Doe*, 642 F.3d 1112, 1117-18 (D.C. Cir. 2011).

Even if Common Cause could resuscitate this argument here, it would fail.

To assert associational standing, an organization must demonstrate that "'(1) at

least one of its members would have standing to sue in his own right, (2) the

interests the association seeks to protect are germane to its purpose, and (3) neither

the claim asserted nor the relief requested requires that an individual member of

the association participate in the lawsuit.'" *Chamber of Commerce*, 642 F.3d at

200 (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)); *accord*

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977);

*Nat'l Ass'n of Home Builders*, 667 F.3d at 12.

> The complaint alleges that:
>
> The members of Common Cause have been deprived during the 2010 elections and will be deprived during the 2012 elections of relevant information concerning the identities of the corporations and wealthy individuals who are secretly spending millions to finance negative campaign ads by Super PACs and other front organizations to support or defeat both candidates in the presidential and congressional primary and general election campaigns.

Compl. ¶ 9(D)(1)(d), JA27. This allegation fails to satisfy the first prong of

associational standing, as "it is not enough to aver that unidentified members have

been injured . . . . [T]he petitioner must specifically 'identify members who have

suffered the requisite harm.'" *Chamber of Commerce*, 642 F.3d at 199 (quoting

*Summers*, 555 U.S. at 499). Neither the complaint nor Common Cause's brief on

appeal specifically identifies any member who is deprived of this information or

how such member is injured from lack of such information. *See Am. Chemistry*

*Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[T]he identity

of the party suffering an injury in fact must be firmly established" for associational

standing.).

Furthermore, the allegation that Common Cause's members have been

deprived of campaign finance information they would like disclosed does not

demonstrate injury-in-fact.  It is well-established that "informational injury" can

be the basis for standing *only* where the complaining party "fails to obtain

information *which must be publicly disclosed pursuant to a statute*."  *FEC v.*

*Akins*, 524 U.S. 11, 21 (1998) (emphasis added); *accord Feld Entertainment*, 659

F.3d at 22; *Common Cause*, 108 F.3d at 418 (standing based on informational

injury is "expressly limited . . . to those cases where the information denied is . . .

required by Congress to be disclosed").  Common Cause identifies no statute that

requires disclosure of the information its members seek – indeed, Common

Cause's claim is that the Senate's debate rules prevented Congress from enacting

such a law.

 Contrary to Common Cause's assertion, its members do not suffer

"precisely the type of injury held sufficient to support standing in *FEC v. Akins*,"

Appellants' Br. at 38, but its exact opposite.  The *Akins* plaintiffs asserted that

information they sought was *required* by law to be disclosed, 524 U.S. at 21;

Common Cause alleges that the law currently *does not require* disclosure of

information they seek, but that Common Cause supports legislation requiring

disclosure that failed to pass the Senate.  Thus, it cannot establish standing based

on informational injury to its members.[12]

###   b.   DREAM Act plaintiffs lack injury-in-fact

The DREAM Act plaintiffs assert that "[t]hey were injured-in-fact when Rule XXII unconstitutionally deprived them of the *opportunity to benefit* from the Act's offer of a path to citizenship and remained at risk of deportation." Appellants' Br. at 28. As the district court correctly held, any harm from being deprived of the opportunity to benefit from potential legislation that was never enacted into law is "hypothetical, rather than concrete," and, thus, insufficient for standing. Mem. Op. at 23, JA88. Congress' failure to pass a law that benefits an individual does not constitute injury-in-fact because it invades no cognizable interest. *See Hoffman v. Jeffords*, 175 F. Supp. 2d 49, 56 n.3 (D.D.C. 2001) ("[I]t is doubtful that anyone has a right to certain legislation being enacted by Congress."), *aff'd*, 2002 WL 1364311 (D.C. Cir. May 6, 2002). As the court below noted, "to recognize such an injury as sufficient for Article III standing would potentially permit standing for any individual who would have benefitted from any piece of legislation that passed one House of Congress but not the

---

[12]  The district court likewise rejected Member plaintiffs' assertion of informational standing, which they have not raised on appeal, because they did not "identify a statute that entitles them to [the] information" they seek. Mem. Op. at 28 n.12, JA93.

other." Mem. Op. at 24, JA89.[13]

Plaintiffs argue that the court below erred in denying them standing because "[i]ndividuals have a non-statutory cause of action to enforce constitutionally prescribed procedures" in Article I. Appellants' Br. at 31-32. But this claim misunderstands the district court's holding as well as defendants' arguments. The district court did not hold, and defendants do not argue, that plaintiffs lack a cause of action under Article I, but rather that they lack a cognizable injury-in-fact sufficient for standing. Mem. Op. at 18, 20-21, JA83, 85-86.

### c.      Plaintiffs do not have a procedural injury

Common Cause and the DREAM Act plaintiffs argue that their injury arises not simply from their failure to receive the benefits of the DREAM and DISCLOSE Acts, but also from alleged harm to their Article I "procedural rights" governing the enactment of statutes. Appellants' Br. at 32. The court below rejected the claim of such "procedural injury," Mem. Op. at 15-21, JA80-85, and plaintiffs offer no basis for this Court to overturn that conclusion.

---

[13]  As noted *supra* n.7, the Senate, after achieving cloture, passed an immigration bill containing the "DREAM Act." 159 Cong. Rec. S5376-77 (daily ed. June 27, 2013). So, to the extent plaintiffs continue to assert injury from the Senate's failure to pass the DREAM Act, they must argue that they are injured not because the Senate failed to pass the Act, as it now has, but because it failed to pass the version that plaintiffs prefer or to do so when plaintiffs desired. Such "harm" cannot be considered cognizable injury-in-fact.

The concept of "procedural injury" – developed in administrative cases and in equal protection challenges where a person was denied government consideration due to impermissible criteria – has no application in the legislative context. As the district court explained, "Plaintiffs identify no authority for the proposition that an individual has a 'procedural right' to any particular form of congressional consideration or debate on a bill." *Id.* at 17, JA82. Also, whereas in "procedural injury" cases, courts may vacate the agency action and remand to the agency to reconsider the matter under the proper procedures, *see, e.g.*, *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007), such relief is not possible in the congressional context as courts cannot order Congress "on remand" to reconsider legislation.

Even if it had any applicability to the legislative context, which it does not, simply invoking a "procedural injury" does not relieve plaintiffs' burden to satisfy each requirement for standing, including demonstrating injury-in-fact. *See Fla. Audubon Soc'y*, 94 F.3d at 664 (procedural standing doctrine "does not – and cannot – eliminate any of the 'irreducible' elements of standing"); *see also Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing."). To demonstrate a "procedural injury," a plaintiff must show "a substantive injury from the denial of the

-38-

statutorily required procedure," *Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 99

(D.C. Cir. 1995), and that "the procedures in question are designed to protect some

threatened concrete interest of his that is the ultimate basis of his standing."

*Lujan*, 504 U.S. at 573 n.8.  As the district court correctly found, plaintiffs have

"failed to demonstrate that they have a 'procedural right' to enactment of

legislation" or that "any such right was designed to protect their particularized

interest."  Mem. Op. at 15-16, JA80-81.

On appeal, plaintiffs surprisingly argue that the district court erred in

finding that they lacked a procedural injury by inappropriately reaching "the

merits of plaintiffs' constitutional claims . . . when it ruled that the plaintiffs have

no procedural rights under the Constitution to enactment of legislation by a simple

majority vote."  Appellants' Br. at 10.  This argument misunderstands the district

court's ruling.  For procedural standing, plaintiffs "must show *both* (1) that their

procedural right has been violated, *and* (2) that the violation of that right has

resulted in an invasion of their concrete and particularized interest."  *Center for

Law and Educ.*, 396 F.3d at 1159.  In finding that plaintiffs had not "point[ed] to a

precise procedural right conferred by Article I," or "to a concrete interest,

particular to these Plaintiffs, that Article I . . . was designed to protect," Mem. Op.

at 21, JA86, the district court properly applied the test for procedural standing.

Nowhere in its opinion did the court rule on the merits of plaintiffs' claims against

the Cloture Rule.   Indeed, it correctly held that it lacked jurisdiction to do so.

Nor do any of the cases plaintiffs cite, Appellants' Br. at 29-32 (citing *Bond v. United States*, 131 S. Ct. 2355 (2011); *INS v. Chadha*, 462 U.S. 919 (1983); *Clinton v. City of New York,* 524 U.S. 417 (1998)), undermine the district court's conclusion.   *Bond*, a criminal action where the defendant challenged the constitutionality of the statute she was charged with violating, 131 S. Ct. at 2360-61, did not address whether a plaintiff satisfied injury-in-fact sufficient to invoke federal court jurisdiction under Article III.   The district court correctly recognized that "*Bond* stands for the proposition that where a plaintiff has already suffered an Article III injury-in-fact due to a statute, that individual can challenge the statute's validity under the Constitution," not "the proposition that the Constitutional principle of separation of powers confers an individual right that is sufficient to meet the more relaxed requirements of procedural standing."   Mem. Op. at 20, JA85.

Plaintiffs' reliance on *INS v. Chadha* and *Clinton v. City of New York* is also flawed.   Neither case addressed "procedural standing," as the district court noted. *Id*. at 17, JA82.   Rather, plaintiffs in those cases cited concrete and particularized, substantive injuries (in *Chadha*, impending deportation; in *Clinton*, requirement to reimburse money and elimination of a tax benefit), and they claimed a constitutional defect in the government's actions that led to their injuries (the

"one-House" veto in *Chadha*, the "line-item veto" in *Clinton*).  "Nowhere in either

case . . . did the Court analyze whether or not the Constitution, and more

specifically Article I, confers an individual procedural right sufficient for

standing."  *Id.* at 18, JA83.

### B.   Plaintiffs Do Not Demonstrate Causation or Redressability for Their Alleged Injuries

As the district court correctly held, none of the plaintiffs "can show

causation or redressability" for their purported injuries.  *Id.* at 24-25, JA89-90.

First, neither the complaint nor appellants' brief addresses how plaintiffs' alleged

injuries are fairly traceable to the actions of the particular *named* defendants in this

case.  Neither the Secretary, the Sergeant at Arms, nor the Parliamentarian is

permitted to participate in debate, *see* Senate Rule XIX; Floyd M. Riddick and

Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices*, S. Doc.

No. 101-28, at 717 (Alan S. Frumin ed., rev. ed. 1992) [hereinafter "*Riddick's

Senate Procedure*"] ("Debate is the prerogative of Senators on the floor."); to vote

on any bill, nomination, or motion, *see* Rule XII; to close debate, *see* Rules XIX

(Senator shall not be interrupted in debate except by his or her consent), XXII

(cloture motion must be signed by 16 *Senators*); or to adopt or amend Senate

rules.  Similarly, none of these officers has authority to compel the Senate to vote

on any measure.  *See* Rule XX.1; *Riddick's Senate Procedure* at 989 ("The Chair

rules on points of order, not the Parliamentarian; the Parliamentarian merely advises the Chair."). Hence, plaintiffs cannot show that *these* defendants caused their alleged injuries.

Nor can the injuries be traced to the Vice President. The Senate and not the Vice President adopted the rules and procedures governing debate in the Senate. *See Riddick's Senate Procedure* at 1026 (Vice President "has no rulemaking power over the Senate"). Even when the Vice President is presiding over the Senate,[14] it is the Senate that ultimately decides its procedures and rules, as all rulings by the presiding officer interpreting and applying Senate rules are subject to appeal and determination by the Senate. *Id.* at 146 ("Decisions of the Chair are subject to appeal and by a majority vote the Senate may reverse or overrule any decision by the Chair."). In addition, the Vice President is not permitted to participate in debate, *id. at* 717, 1391, "nor does he have a right to engage in conversation with Senators on the floor." *Id.* at 766. Therefore, he has not been, and cannot be, part of any attempt to block a measure from a vote in the Senate by unlimited debate.

Even had plaintiffs named a defendant who had the authority to amend the Senate's rules and invoke cloture on pending measures, their allegations would

---

[14]  The Vice President was not presiding over the Senate during the cloture votes on either the DREAM or DISCLOSE Acts.

nonetheless fail to demonstrate that their injuries are fairly traceable to the Cloture Rule and the failure to invoke cloture on the DREAM or DISCLOSE Acts.  As the previous Cloture Rule cases in this Circuit demonstrate, it is inherently speculative to link any particular legislative outcome to the Senate's debate procedures as those procedures represent but one part of the legislative process.  As the district court explained,

> There is no guarantee that, but for the cloture rule, the legislation favored by [plaintiff] would have passed the Senate; that similar legislation would have been enacted by the House of Representatives; and that the President would have signed into law the version passed by the Senate. There are too many independent actors and events in the span between a cloture vote and the failure to pass legislation to characterize the connection as direct.

Mem. Op. at 25, JA90 (quoting *Page v. Shelby*, 995 F. Supp. at 29).

Plaintiffs argue that the district court erred in finding lack of causation because the court (1) failed to accept as true their allegation that the DREAM and DISCLOSE Acts "would have been passed by the Senate and been enacted into law, but for . . . Rule XXII," Appellants' Br. at 41-42 (emphasis omitted); and (2) imposed a higher standard for causation, which should be relaxed in "procedural standing" cases. *Id*. at 40-41.  Neither argument has merit.

In considering a motion to dismiss, the court accepts as true the factual allegations in the complaint, but not "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor legal

conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292

F.3d 235, 242 (D.C. Cir. 2002) (internal quotation marks and citation omitted).

Plaintiffs' assertion that Congress would have passed, and the President would

have signed, the DREAM or DISCLOSE Acts in a form that would have benefited

plaintiffs is not a *factual* allegation, as the court below noted, but a "conclusory

allegation that the Court need not accept." Mem. Op. at 25 n.9, JA90.[15]  Indeed,

granting standing based on supposition as to what action Congress would have

taken on a particular bill would raise serious separation-of-powers concerns. *Cf.*

*Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116, 132 (2[d] Cir. 2000)

("conferring standing to [plaintiff] based on its own prediction of Congress's

actions, . . . would expand [the court's] authority well beyond any zone of twilight

that might exist between legislative and judicial authority").

Second, the district court did not impose an "improperly high standard" for

causation.  Plaintiffs argue that courts apply "more relaxed standards for causation

in cases alleging a procedural rights violation," and that the court below erred

---

[15]  Contrary to plaintiffs' suggestion, Compl. ¶ 9(D), how the Senate would vote
on final passage cannot always be surmised simply based on how the Senate voted
on cloture on the measure, as a vote to close debate is not a guarantee of ultimate
support for a bill.  *See, e.g.*, 154 Cong. Rec. 19115-16, 19393 (2008) (roll call
votes 200 and 201) (on S. 3001, Senators Byrd and Sanders voted for cloture, but
against final passage, while 26 Senators voted against cloture, but voted for
passage); 153 Cong. Rec. 28708, 28719 (2007) (roll call votes 398 and 400) (on S.
294, nine Senators voted for cloture but against final passage; one voted against
cloture and for passage).

when it found that they could not show that the legislation would have passed and they would have benefited from it. Appellants' Br. at 40. As explained earlier, however, plaintiffs' allegations do not establish "procedural injury"; moreover, even a plaintiff asserting a procedural injury must demonstrate that the injury is fairly traceable to the defendants, *see City of Dania Beach*, 485 F.3d at 1187; *Fla. Audubon Soc'y*, 94 F.3d at 664 ("[A] prospective plaintiff must demonstrate that the defendant caused the particularized injury, and not just the alleged procedural violation."), which plaintiffs here cannot do. The court applied the correct standard in finding that plaintiffs failed to demonstrate causation.

Plaintiffs also fail the third prong of standing because a favorable decision cannot redress their alleged injuries. First, the Court cannot require the Senate to vote on the DREAM or DISCLOSE Acts as it lacks power to order the Senate to close debate and vote on any piece of legislation. *See Newdow v. U.S. Congress*, 328 F.3d 466, 484 (9th Cir. 2003) ("[I]n light of the Speech and Debate Clause of the Constitution, Art. I, § 6, cl. 1, the federal courts lack jurisdiction to issue orders directing Congress to enact or amend legislation."), *rev'd on other grounds*, 542 U.S. 1 (2004); *cf. Hastings v. U.S. Senate, Impeachment Trial Comm.*, 716 F. Supp. 38, 41 (D.D.C.) (rejecting impeached judge's request to enjoin Senate's impeachment proceedings, finding "[t]he relief sought by plaintiff . . . would be utterly foreign to our system of divided powers"), *aff'd*, 887 F.2d 332 (D.C. Cir.

-45-

1989) (table).[16]

Plaintiffs maintain that the Court can avoid this obstacle by granting a declaratory judgment holding the 60-vote requirement in the Cloture Rule unconstitutional and severing that clause from the rule, thereby, in plaintiffs' reasoning, establishing cloture by majority vote. *See* Appellants' Br. at 45.[17]  Not only is it dubious that courts have authority to sever parts of a Senate rule in the same way as a federal statute, but even assuming that it could, the Court would have to find that the Senate would have enacted the balance of the Cloture Rule without the 60-vote requirement if it had known that it could not constitutionally include such a requirement.  *See Basardh v. Gates*, 545 F.3d 1068, 1070 (D.C. Cir. 2008) (per curiam) ("Severability . . . turns on legislative intent.  Courts must ask: 'Would Congress still have passed the valid sections had it known about the constitutional invalidity of the other portions of the statute?'") (quoting *United States v. Booker*, 543 U.S. 220, 246 (2005) and citation omitted).  Given the extensive legislative deliberations and compromises over the past century that led

---

[16]   As the Senate recently passed a version of the DREAM Act as part of the immigration bill, S. 744, that proposed Act is pending in the House and not the Senate.

[17]  Plaintiffs request that only certain parts of the Cloture Rule be invalidated because declaring the rule itself unconstitutional would leave the Senate with no mechanism to close debate over the objection of a Senator, and would "return [the Senate] to its former practice of allowing unlimited debate unless there existed unanimous consent to close debate."  *Page*, 995 F. Supp. at 29.

to the current Cloture Rule, there is ample basis to conclude that the Senate would *not* have enacted a Cloture Rule without the heightened vote threshold, as it has not adopted such a rule in 200 years.

Furthermore, merely limiting the remedy to declaratory relief would not alleviate the interference in the Senate's proceedings that such judicial action would entail. Plaintiffs' requested declaratory judgment seeks a judicial rewrite of Senate rules, which would be an unprecedented and improper intrusion on the Senate's constitutional power to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. As this Court cautioned in the most recent Cloture Rule case to come before it, "a request for judicial substitution of a simple majority rule for cloture on judicial nominations" constitutes a "judicial rewrite" of Senate rules that "would obviously raise the most acute problems, given the Senate's independence in determining the rules of its proceedings and the novelty of judicial interference with such rules." *Judicial Watch*, 432 F.3d at 361.

Finally, plaintiffs argue they "need not prove that removal of a [procedural] barrier . . . would guarantee an altered outcome for the plaintiff" to demonstrate redressability. Appellants' Br. at 45. But simply declaring the Cloture Rule unconstitutional and striking the 60-vote requirement will not redress plaintiffs' alleged injury from the procedural "barrier" of that rule. Rather, to provide redress to plaintiffs' alleged procedural injury, the Court would have to provide plaintiffs

another opportunity for Senate consideration of the failed bills without the Cloture

Rule's 60-vote requirement.  But those House bills *lapsed* at the end of the 111th

Congress and cannot be brought before the Senate two Congresses later.

Moreover, no court has authority to dictate to the Senate what legislation to

consider; that is up to the Senate alone.  Whether the Senate would voluntarily

take up either bill were the Cloture Rule invalidated is entirely too speculative to

render declaratory relief "likely" to redress plaintiffs' injuries.[18]

## II.     THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' COMPLAINT PRESENTS A NON-JUSTICIABLE POLITICAL QUESTION

The Supreme Court in *Baker v. Carr*, 369 U.S. 186, 217 (1962), identified

six factors, the existence of any of which indicates a political question.  *Schneider*

*v. Kissinger*, 412 F.3d 190, 193-94 (D.C. Cir. 2005).  The district court found that

plaintiffs' challenge to the Cloture Rule directly implicated three of those factors.

First, applying the holding in *Nixon*, 506 U.S. 224, the court concluded that

plaintiffs' claims involve a matter textually committed by the Constitution to the

---

[18]  In fact, the Senate adopted a version of the DREAM Act as part of the immigration bill it passed on June 27, 2013.  159 Cong. Rec. S5376-77.

Even if the Senate did proceed to consider legislation similar to the DISCLOSE Act, and closed debate and passed such legislation, the bill would still require House passage and presidential signature before plaintiffs could benefit from that legislation – a scenario inherently too speculative to support Article III standing. *See* Mem. Op. at 27, JA92.

Senate in the Rulemaking Clause, Art. I, § 5, cl. 2, and that no separate, express provision of the Constitution limited the Senate's discretion in structuring debate. Mem. Op. at 39-41, JA104-06. Second, the court found a lack of manageable standards "by which the Court could judge whether or not the Cloture Rule is constitutionally valid." *Id*. at 44, JA109. Finally, the court found that "reaching the merits of this case would require an invasion into internal Senate processes at the heart of the Senate's constitutional prerogatives as a House of Congress, and would thus express a lack of respect for the Senate as a coordinate branch of government." *Id*. at 45-46, JA110-11. Plaintiffs fail to demonstrate error in these findings.

Plaintiffs argue that Senate debate rules are not matters textually committed to the Senate as "congressional rules that conflict with constitutional provisions are subject to judicial review," citing the Supreme Court's decisions in *Yellin v. United States*, 374 U.S. 109 (1963); *United States v. Smith*, 286 U.S. 6 (1932); *United States v. Ballin*, 144 U.S. 1 (1892); and *Powell v. McCormack*, 395 U.S. 486 (1969). Appellants' Br. at 47, 51. The district court considered each of these cases and correctly found that none supported the justiciability of plaintiffs' case.

*Yellin* was an appeal by a criminal defendant who had been convicted of contempt of Congress for refusing to answer questions from a congressional committee that had subpoenaed his testimony. 374 U.S. at 111. The Supreme

-49-

Court overturned the conviction because the committee had not complied with its own rules in considering the defendant's request to testify in executive (*i.e.*, non-public) session. *Id.* at 121-23. In contrast, plaintiffs here do not claim that the Senate has failed to follow its Cloture Rule, but rather that the Rule is unconstitutional. Since *Yellin* did not address the constitutionality of Senate rules, *see* 374 U.S. at 111, it sheds no light on the justiciability of plaintiffs' claims here.

*Smith* is similarly inapposite. *Smith* involved a challenge to the validity of a Presidential appointment when the Senate, after having sent notice of its confirmation of the appointment, reconsidered that confirmation and voted not to consent to the nomination. 286 U.S. at 27-30. As the Court explained, "[t]he question primarily at issue relates to the construction of the applicable [Senate] rules, not to their constitutionality," *id.* at 33, and, therefore, the Senate's power to enact the rules in question "need not be considered." *Id.* Judicial review of the constitutionality of Senate rules simply was not at issue there.

In *Ballin*, the plaintiff argued that the House's passage of a statute was invalid for lack of a quorum and the House rule for determining a quorum was unconstitutional. 144 U.S. at 4-5. The Court explained that the Constitution "empowers each house to determine its rules of proceedings," and while those rules may not "ignore constitutional restraints or violate fundamental rights," "within the limitations suggested" the power of each House to make its rules is

-50-

"absolute and beyond the challenge of any other body." *Id*. at 5. The Court found that there was "no constitutional method prescribed" for determining a quorum, "no constitutional inhibition of any of [the possible methods of determining a quorum]," and "no violation of fundamental rights" by the House's rule. *Id*. at 6. Accordingly, the rule was not subject to challenge in the courts. Plaintiffs here have likewise not identified any express "constitutional method" or "inhibition" on how the Senate conducts debate or determines when to close debate, nor "point[ed] to fundamental rights which have been violated" by the Cloture Rule. Mem. Op. at 43, JA108. Consequently, the Senate's decision as to its mechanism for closing debate is "beyond the challenge of any other body." *Ballin*, 144 U.S. at 5.[19]

*Powell*, where the Court held a former congressman's challenge to his exclusion from the House was justiciable, *see* 395 U.S. at 547-50, also does not support plaintiffs' argument. As the Supreme Court explained in *Nixon*, the Court in *Powell* found the claim justiciable because the House's exclusion of the congressman was an exercise of its power to judge the qualifications of its Members, U.S. Const. art. I, § 5, cl. 1, and that power was expressly limited to the three textual criteria in the Constitution, art. I, § 2, cl. 2 (age, residency, and

---

[19] Although *Ballin* was decided 70 years before the Court's modern explication of the political question doctrine in *Baker v. Carr*, the Court's opinion in *Ballin* anticipates the contours of that doctrine as it has developed since.

citizenship). *Nixon*, 506 U.S. at 237. The existence of that "separate provision specifying the only qualifications which might be imposed for House membership" made justiciable the House's exclusion of Representative Powell on a ground other than those three express qualifications. *Id*. While "[t]he decision as to whether a Member satisfied the[] [age, residency and citizenship] qualifications *was* placed with the House, . . . the decision as to what these qualifications consisted of was not." *Id*. Here, as in *Nixon* and unlike in *Powell*, the Constitution sets forth no specific textual limits on the Senate's debate rules.

Thus, none of these cases undermines the district court's conclusion, Mem. Op. at 40-43, JA105-08, that plaintiffs have failed to identify any separate constitutional provision that limits the Senate's authority to determine how to conduct floor debate – including how long such debate should continue and in what manner it should be brought to a close. None of the constitutional provisions cited in the complaint – the Quorum Clause, Art. I, § 5, cl. 1, the Presentment Clause, Art. I, § 7, cl. 2, constitutional requirements for "supermajority votes" on certain matters, and the general "principle of majority rule," *see* Compl. ¶¶ 1, 2, 59(a), 78, JA14, 15, 51, 61 – limits the Senate's power to regulate debate in the Chamber. In light of the plenary grant of authority in the Rulemaking Clause and the absence of an express textual limit on that power when applied to the length and method of debate, the district court correctly concluded that the matter was

-52-

committed to the Senate by the Constitution.

Plaintiffs challenge the district court's finding of a lack of judicially manageable standards for resolving plaintiffs' claims by pointing to the Presentment Clause of Article I, section 7. Appellants' Br. at 53. That Clause provides that "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States," and sets out the President's authority to sign or veto the law within ten days, and the consequences and proceedings thereon. U.S. Const. art. I, § 7, cl. 2. *Nothing* in that Clause addresses or restricts what debate procedures the Senate may adopt, and thus, the Clause provides no manageable standard for judging plaintiffs' challenge to the Cloture Rule.

Plaintiffs also suggest that the Cloture Rule can be judged against "a structural, historical, and textual requirement that majority rule governs legislative procedures." Appellants' Br. at 54. But they point to no text in the Constitution establishing such a requirement, offer no historical evidence for such a requirement in light of the 200 years the Senate has proceeded without a "majority cloture" rule, and provide no "structural" basis for inferring such a requirement, given the numerous longstanding rules and procedures through which a minority of Senators may forestall or prevent passage of proposed legislation (*e.g.*, referral of matters to committees, and Majority Leader's right of first recognition and

ability to control the Senate's floor schedule).  Neither the Presentment Clause nor the "requirement for majority rule" provides a judicially manageable standard for deciding plaintiffs' claims.

Plaintiffs' assertion that addressing the merits of their claims would not be "a disrespectful intrusion into the Senate's affairs," *id.*, wholly disregards the invasive inquiry into internal Senate processes that such consideration would entail – including reviewing the Senate's scheduling of legislative business, interpreting rules for debate within the body, determining how long such debate may continue, and deciding how and when debate should be closed and votes taken.  Judicial intrusion into these matters at the heart of the Senate's constitutional prerogatives would express a lack of respect for the Senate as a coequal branch of government.  Indeed, plaintiffs' request for a declaratory judgment striking one clause of the Cloture Rule "obviously would raise the most acute problems, given the Senate's independence in determining the rules of its proceedings and the novelty of judicial interference with such rules." *Judicial Watch*, 432 F.3d at 361.

Plaintiffs' argument that a Senate rule should not be given greater deference before the courts than a federal statute, the validity of which courts commonly review, Appellants' Br. at 55, is misguided.  Determining what the law is and applying it to individual legal disputes arising after laws have been enacted is

precisely what courts do – the very "check and balance" provided by the Judiciary. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-78 (1803). That is a far cry, however, from the claim that courts may appropriately oversee and control the deliberative workings of Congress – which would encroach upon, rather than check, legislative power. Under the separation of powers, it is for the Senate, and not this Court, to set the procedures for regulating debate in the Chamber.

## III. THE COURT MAY ALSO AFFIRM ON THE ALTERNATIVE GROUND THAT PLAINTIFFS' CLAIMS ARE BARRED BY THE SPEECH OR DEBATE CLAUSE

The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. "The purpose of the Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently." *Eastland*, 421 U.S. at 502. To insure legislative independence, the Clause protects from judicial inquiry "all activities that are 'an integral part of the deliberative and communicative processes . . . with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'" *Howard v. Office of Chief Administrative Officer of U.S. House of Representatives*, — F.3d —, 2013 WL 3242113 *6 (D.C. Cir. June 28, 2013) (quoting *Gravel v. United States*, 408 U.S. 606, 625 (1972)).

-55-

Because of its importance to the Legislative Branch's constitutional functions, the Supreme Court has consistently "read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501. The Court has held that the Clause provides immunity from suit for all actions "within the sphere of legitimate legislative activity," *id.*, which encompasses "anything 'generally done in a session of the House by one of its members in relation to the business before it.'" *Doe v. McMillan*, 412 U.S. 306, 311 (1973) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881)).

Plaintiffs' suit challenging the Senate's rules for considering and debating legislation questions matters that fall squarely within the Speech or Debate Clause's protection and, thus, is barred. Plaintiffs assert that a minority of Senators have used the Cloture Rule to prevent votes on the DREAM and DISCLOSE Acts. Compl. ¶ 9(D), JA26. This claim directly implicates the "speech or debate" of Senators, as it literally challenges the rules by which Senators debate legislation. The decision when to bring a measure to a vote is also legislative action protected by the Clause. *See Gravel*, 408 U.S. at 617 (Clause's immunity "equally cover[s]" "act of voting" as it does actual speech or debate). The procedures the Senate uses to conduct debate, including when debate should be closed, are unquestionably "part of the deliberative and communicative processes by which Members participate in committee and House proceedings

-56-

with respect to the consideration and passage or rejection of proposed legislation." *Id.* at 625. Thus, the Speech or Debate Clause bars plaintiffs' claims.

Plaintiffs' choice to sue Senate officers instead of the Senate or Senators does not evade the Speech or Debate Clause bar. The Supreme Court has made clear that the Clause broadly applies not only to actions against Members of Congress but also to suits against congressional officers and employees, in order to protect Congress' constitutionally prescribed functions. Speech or Debate protection "applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Id.* at 618; *accord Eastland*, 421 U.S. at 507 (Clause protects congressional staff as well as Members); *Howard*, 2013 WL 3242113, *6. If legislative conduct would be immune if performed by a Senator, then the conduct is also immune when performed by legislative officers or staff.[20]

Plaintiffs have not alleged any actions by the Vice President, the Secretary, the Sergeant at Arms, or the Parliamentarian that fall outside the scope of legitimate legislative activity on behalf of Senators; indeed, other than naming

---

[20] The Supreme Court has allowed cases to proceed against congressional officers only when the officers acted outside the legitimate legislative sphere, *i.e.*, took non-legislative actions. *See, e.g., Doe v. McMillan*, 412 U.S. at 315 ("legislative functionaries carrying out . . . nonlegislative directives"); *Powell*, 395 U.S. at 503-06; *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967) (per curiam); *Kilbourn*, 103 U.S. at 199-200, 203-04.

them as defendants, plaintiffs make no allegations at all regarding these officers.

To whatever extent these officers assist the Senate in carrying out debate under its

rules,[21] such activity would fall within the legislative sphere and be protected by

the Speech or Debate Clause.

---

[21] As explained earlier, these defendants do not participate in Senate debate nor can they adopt or amend Senate rules.

## CONCLUSION

For these reasons, the Court should affirm the judgment of the District

Court.

Respectfully submitted,

/s/ Morgan J. Frankel
MORGAN J. FRANKEL
D.C. Bar #342022
Senate Legal Counsel
morgan_frankel@legal.senate.gov

PATRICIA MACK BRYAN
D.C. Bar #335463
Deputy Senate Legal Counsel

GRANT R. VINIK
D.C. Bar #459848
Assistant Senate Legal Counsel

THOMAS E. CABALLERO
Assistant Senate Legal Counsel

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
(202) 224-4435 (tel)
(202) 224-3391 (fax)

Dated:   July 18, 2013                    Counsel for Appellees

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION AND
TYPEFACE AND TYPE STYLE REQUIREMENTS
OF FED. R. APP. P. 32(a)**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because:

(1) this brief contains 13,946 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1); and

(2) this brief has been prepared in a proportionally spaced typeface using Word Perfect X6 in Times New Roman, 14-point font.

/s/ Morgan J. Frankel
MORGAN J. FRANKEL

-60-

# CERTIFICATE OF SERVICE

I certify that, on July 18, 2013, I filed electronically the foregoing Brief of

Appellees with the Clerk of the Court using the CM/ECF system, which will

provide notice of electronic filing to the following:

> Emmet J. Bondurant
> bondurant@bmelaw.com
> BONDURANT, MIXON, and ELMORE, LLP
> 3900 One Atlantic Center
> 1201 W. Peachtree Street
> Atlanta, GA 30309
>
> Stephen Spaulding
> sspaulding@commoncause.org
> COMMON CAUSE
> 1133 19th Street, NW, Suite 900
> Washington, DC 20036
>
> Counsel for Appellants

> /s/ Morgan J. Frankel
> MORGAN J. FRANKEL

# Addendum

## SENATE RULE V
## SUSPENSION AND AMENDMENT OF THE RULES

1. No motion to suspend, modify, or amend any rule, or any part thereof, shall be in order, except on one day's notice in writing, specifying precisely the rule or part proposed to be suspended, modified, or amended, and the purpose thereof. Any rule may be suspended without notice by the unanimous consent of the Senate, except as otherwise provided by the rules.

2. The rules of the Senate shall continue from one Congress to the next Congress unless they are changed as provided in these rules.

SENATE RULE XXII

PRECEDENCE OF MOTIONS

1. When a question is pending, no motion shall be received but ---

> To adjourn.

> To adjourn to a day certain, or that when the Senate adjourn it shall be to a day certain.

> To take a recess.

> To proceed to the consideration of executive business.

> To lay on the table.

> To postpone indefinitely.

> To postpone to a day certain.

> To commit.

> To amend.

Which several motions shall have precedence as they stand arranged; and the motions relating to adjournment, to take a recess, to proceed to the consideration of executive business, to lay on the table, shall be decided without debate.

2. Notwithstanding the provisions of rule II or rule IV or any other rule of the Senate, at any time a motion signed by sixteen Senators, to bring to a close the debate upon any measure, motion, other matter pending before the Senate, or the unfinished business, is presented to the Senate, the Presiding Officer, or clerk at the direction of the Presiding Officer, shall at once state the motion to the Senate, and one hour after the Senate meets on the following calendar day but one, he shall lay the motion before the Senate and direct that the clerk call the roll, and upon the ascertainment that a quorum is present, the Presiding Officer shall, without debate, submit to the Senate by a yea-and-nay vote the question:

"Is it the sense of the Senate that the debate shall be brought to a close?" And if that question shall be decided in the affirmative by three-fifths of the Senators duly chosen and sworn -- except on a measure or motion to amend the Senate rules, in which case the necessary affirmative vote shall be two-thirds of the Senators present and voting -- then said measure, motion, or other matter pending before the Senate,

-2A-

or the unfinished business, shall be the unfinished business to the exclusion of all other business until disposed of.

Thereafter no Senator shall be entitled to speak in all more than one hour on the measure, motion, or other matter pending before the Senate, or the unfinished business, the amendments thereto, and motions affecting the same, and it shall be the duty of the Presiding Officer to keep the time of each Senator who speaks. Except by unanimous consent, no amendment shall be proposed after the vote to bring the debate to a close, unless it had been submitted in writing to the Journal Clerk by 1 o'clock p.m. on the day following the filing of the cloture motion if an amendment in the first degree, and unless it had been so submitted at least one hour prior to the beginning of the cloture vote if an amendment in the second degree. No dilatory motion, or dilatory amendment, or amendment not germane shall be in order. Points of order, including questions of relevancy, and appeals from the decision of the Presiding Officer, shall be decided without debate.

After no more than thirty hours of consideration of the measure, motion, or other matter on which cloture has been invoked, the Senate shall proceed, without any further debate on any question, to vote on the final disposition thereof to the exclusion of all amendments not then actually pending before the Senate at that time and to the exclusion of all motions, except a motion to table, or to reconsider and one quorum call on demand to establish the presence of a quorum (and motions required to establish a quorum) immediately before the final vote begins. The thirty hours may be increased by the adoption of a motion, decided without debate, by a threefifths affirmative vote of the Senators duly chosen and sworn, and any such time thus agreed upon shall be equally divided between and controlled by the Majority and Minority Leaders or their designees. However, only one motion to extend time, specified above, may be made in any one calendar day.

If, for any reason, a measure or matter is reprinted after cloture has been invoked, amendments which were in order prior to the reprinting of the measure or matter will continue to be in order and may be conformed and reprinted at the request of the amendment's sponsor. The conforming changes must be limited to lineation and pagination.

No Senator shall call up more than two amendments until every other Senator shall have had the opportunity to do likewise.

Notwithstanding other provisions of this rule, a Senator may yield all or part of his one hour to the majority or minority floor managers of the measure, motion, or matter or to the Majority or Minority Leader, but each Senator specified shall not have more

than two hours so yielded to him and may in turn yield such time to other Senators.

Notwithstanding any other provision of this rule, any Senator who has not used or yielded at least ten minutes, is, if he seeks recognition, guaranteed up to ten minutes, inclusive, to speak only.

After cloture is invoked, the reading of any amendment, including House amendments, shall be dispensed with when the proposed amendment has been identified and has been available in printed form at the desk of the Members for not less than twenty four hours.

3. If a cloture motion on a motion to proceed to a measure or matter is presented in accordance with this rule and is signed by 16 Senators, including the Majority Leader, the Minority Leader, 7 additional Senators not affiliated with the majority, and 7 additional Senators not affiliated with the minority, one hour after the Senate meets on the following calendar day, the Presiding Officer, or the clerk at the direction of the Presiding Officer, shall lay the motion before the Senate. If cloture is then invoked on the motion to proceed, the question shall be on the motion to proceed, without further debate.

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 5, cl. 2:

**Each House may determine the Rules of its Proceedings**, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.

U.S. Const. art. I, § 6, cl. 1:

The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; **and for any Speech or Debate in either House, they shall not be questioned in any other Place**.